## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
## EL PASO DIVISION

| | | |
|---|---|---|
| **MINER, LTD.,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **EP-19-CV-00082-FM** |
| | § | |
| **PAUL ANGUIANO,  PASEO DEL** | § | |
| **NORTE DOCK PRODUCTS, INC.,** | § | |
| | § | |
| **Defendants.** | § | |

## ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION

Before the court is "Plaintiff Miner, Ltd.'s Renewed Motion for Preliminary Injunction"

("Motion") [ECF No. 20], filed March 8, 2019 by Miner, Ltd. ("Plaintiff"); "Plaintiff Miner

Ltd.'s Supplemental Brief in Support of Renewed Motion for Preliminary Injunction"

("Supplemental Brief") [ECF No. 33], filed April 29, 2019; and "Defendants' Response to

Plaintiff's Renewed Motion for Preliminary Injunction" [ECF No. 37], filed May 6, 2019 by

Defendants Paul Anguiano ("Anguiano") and Paseo Del Norte Dock Products, Inc. ("PDN")

(collectively, "Defendants").  After due consideration, the Motion is **GRANTED**.

## I.    BACKGROUND

### A.    Factual Background

On January 29, 2019, Plaintiff filed suit in the San Antonio Division of the Western

District of Texas, seeking injunctive relief and damages arising out of alleged misconduct by

Anguiano, a former employee of Plaintiff, and PDN, his new employer.[1]  Plaintiff makes the

following allegations: (1) Anguiano solicited Plaintiff's clients in violation of the Amended

---

[1] *See* "Complaint for Injunctive Relief and Damages and Demand for Jury Trial" ("Compl."), ECF No. 1, filed Jan. 29, 2019.

Limited Liability Company Agreement of Miner ("Amended LLC Agreement")[2]; (2) Anguiano

solicited Plaintiff's employees in violation of the Amended LLC Agreement[3]; (3) Anguiano

"improperly disclosed and/or used Miner's propriety information—including its trade secrets—

on behalf of Paseo Del Norte" in violation of the Amended LLC Agreement[4]; (4) Anguiano

solicited Plaintiff's clients in violation of the non-competition, non-solicitation, and

confidentiality covenants in the employment agreement ("Employment Agreement") signed at

the time of his promotion to Account Executive[5];  (5) Anguiano solicited Plaintiff's employees in

violation of the Employment Agreement[6]; (6) Anguiano "improperly disclosed and/or used

Miner's propriety information—including its trade secrets—on behalf of Paseo Del Norte" in

violation of the Employment Agreement[7]; (7) tortious interference[8]; (8) Anguiano and PDN

misappropriated trade secrets in violation of the Defend Trade Secrets Act ("DTSA"), 18 U.S.C.

§ 1836 *et seq.*[9]; (9) Anguiano and PDN misappropriated trade secrets in violation of the Texas

Uniform Trade Secrets Act ("TUTSA"), Tex. Civ. Prac. & Rem. Code § 134A.002 *et seq.*[10]; (10)

---

[2] *Id.* at 16–17.

[3] *Id.* at 18–19.

[4] *Id.* at 19–20.

[5] *Id.* at 20–22.

[6] *Id.* at 22–23.

[7] Compl. 23–25.

[8] *Id.* at 25–26.

[9] *Id.* at 26–27.

[10] *Id.* at 27–29.

Anguiano accessed Plaintiff's computer system in violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030[11]; and (11) Anguiano breached a fiduciary duty to Plaintiff.[12]

Plaintiff is a national company that sells, installs, and services material handling equipment and loading dock products across the nation.[13]  Anguiano was an employee of Plaintiff for seventeen years.[14]  During his time with Plaintiff, he was employed as a salesman, account executive, president, and managing member of Miner El Paso.[15]

> 1.   Subscription and Transaction Agreement and Second Amended and Restated Limited Liability Agreement

Anguiano became a managing member of Plaintiff in exchange for purchasing shares in Plaintiff in June 2012.[16]  On December 12, 2012, Anguiano and CI (MHE) Holdings, LLC—the private entity that acquired Plaintiff—entered into the "Subscription and Transaction Agreement" ("Subscription Agreement"),[17] which contains a non-compete covenant and a non-solicitation covenant.[18]  It provides:

> Section 1.2    Closing. The sale and purchase of the Purchased Units shall take place on the Closing Date (as defined in the Purchase Agreement) (the "Closing"). At the Closing, (a) the Company shall issue and sell to each Purchaser such Purchaser's Purchased Units and (b) each Purchaser shall deliver to the Company cash by wire transfer of immediately available funds to an account designated by the Company prior to the Closing, or by such other mechanism as

---

[11] *Id.* at 29–30.

[12] *Id.* at 31.

[13] "Appendix in Support of Plaintiff's Supplemental Brief in Support of Renewed Motion for Preliminary Injunction" ("App'x."), ECF No. 36, Ex. A (under seal).

[14] App'x, "Oral Deposition of Paul Anguiano" ("Anguiano Depo.") 41: 9–11, Ex. B.

[15] *Id.* at 15, 29, 31, 33, 129, 122.

[16] *See* App'x, "Second Amended and Restated Limited Liability Company Agreement" ("Am. LLC Agreement"), Ex. F.

[17] App'x, "Subscription and Transaction Agreement" ("Subscription Agreement"), Ex. P.

[18] *Id.* at 2.

the Company and such Purchaser may agree, in the amount of such Purchaser's Purchase Price.

. . .

Section 1.4    Non-Competition: Non-Solicitation.

1.41    For a period set forth next to the name of such Purchaser or Non-Purchaser Stockholder on Appendix A hereto commencing on the date of the Closing, each Purchaser and Non-Purchaser Stockholder shall not, directly or indirectly (whether by himself or itself, through an affiliate or in partnership or conjunction with, or as an employee, officer, director, manager, member, owner, consultant or agent of, any other Person):

(a)    undertake, participate or carry on or be engaged or have any financial or other interest in, or in any other manner advise or assist any other Person in connection with the operation of, the business of providing repair service, planned maintenance support, sales and installation, equipment modernization, diagnostics and analytics services for truck loading dock equipment, commercial doors, recycling/waste handling equipment, material handling equipment, security and access control solutions, storefront glass systems to customers, and similar equipment and fixtures located at retail, distribution, manufacturing, healthcare and hospitality companies ("Competing Business") anywhere in North America or any other geographic location in which the Company or its affiliates engages in business;

(b)    solicit, entice, encourage or intentionally influence, or attempt to solicit, entice, encourage or influence, any employee of the Company, MHE, the Companies (as defined in the Purchase Agreement) or their respective affiliates to resign or leave the employ of the Company, MHE, the Companies or their respective affiliates or otherwise hire, employ, engage or contract any such employee to perform services other than for the benefit of the Company, MHE, the Companies or their respective affiliates; or

(c)    solicit, entice, encourage or influence, or attempt to solicit, entice, encourage or influence, any customer of the Company, MHE, the Companies or their respective affiliates (including any Person who has been a customer of the Companies at any time during the period of 12 months before the Closing) to alter, reduce or terminate its business relationship with the Company, MHE, the Companies or their respective affiliates for the direct or indirect benefit of any Competing Business.

For the avoidance of doubt, with respect to each Purchaser and Non-Purchaser Stockholder, the covenants contained in this Section 1.4.1 are in addition to any other non-compete, non-solicit or similar restrictions between such Purchaser or Non-Purchaser Stockholder, on the one hand, and the Company or any of its affiliates, on the other hand, including those contained in the Limited Liability

Company Agreement or any employment agreement with such Purchaser or Non-Purchaser Stockholder.[19]

An attached appendix to the Subscription Agreement specifies that Anguiano was subject to a non-compete and non-solicitation period for a duration of two years from the closing of the sale.[20]

CI (MHE) Holdings, LLC and Anguiano entered into another agreement five days later on December 17, 2012: the "Second Amended and Restated Limited Liability Company Agreement" ("Amended LLC Agreement").[21]  It sets forth:

Section 12.3 Post Employment

(a) Each Management Member further agrees that, for a period of three (3) years (or such other period as may be specified in the Subscription Agreement or Profits Interest Award Agreement relating to such Management Member) after the cessation or termination of his or her employment or consultancy with the Company or its applicable Subsidiary, whether voluntary or involuntary, with or without cause (the "Non-Compete Period"), he or she shall not, either directly or indirectly: (i) engage in the Business for such Management Member's own account; (ii) render any services or give advice related to the Business to or for any Person that is engaged or is about to become engaged in the Business; (iii) assist any other Person to engage in any activities competitive with the Business of the Company or any Subsidiary of the Company; or (iv) become, directly or indirectly (and whether or not for compensation), a stockholder, partner, member, manager, employee, contractor, agent or consultant of (or establish any other similar affiliation, relationship or capacity with) any Person that is engaged or is about to become engaged in the Business, other than passive ownership as a portfolio investment (with no director designation rights or other special governance rights) of no more than five percent (5%) of the outstanding equity securities of any corporation listed on a national securities exchange.

(b) Without limiting the foregoing, each Management Member further agrees that, for a period of three (3) years (or such other period as may be specified in the Subscription Agreement or Profits Interest Award Agreement relating to such Management Member) after the cessation or termination of his or her employment or consultancy with the Company or its applicable Subsidiary, whether voluntary or involuntary, with or without cause (the "Non-Solicit Period"), he or she shall not, either directly or

---

[19] *Id.* at 2–3.

[20] *See id.*, App'x. A.

[21] App'x., "Second Amended and Restated Limited Liability Company Agreement" ("Am. LLC Agreement"), Ex. F.

indirectly, hire, solicit (or encourage any other Person to hire or solicit) or encourage to leave the employment of the Company or any Subsidiary of the Company, any Person, whether full or part-time, who is an officer, employee, contractor or consultant (other than a contractor or consultant who is a third party service provider whose services are generally available) of, or to, the Company or any Subsidiary of the Company on the date hereof or who has been employed or engaged by the Company or any Subsidiary of the Company within one (1) year prior to the date of such hiring or solicitation. Notwithstanding the foregoing, general solicitations of employment published in a newspaper, over the Internet, or in another publication of general circulation and not specifically directed towards such officers, employees or consultants shall not be deemed to constitute solicitation for purposes of this Section 12.3(b).

(c) Without limiting the foregoing, each Management Member further agrees that during the Non-Solicit Period, he or she shall not, directly or indirectly, seek to induce or otherwise cause any customer, supplier, vendor, licensee or any other Person with whom the Company or any Subsidiary of the Company then has, or during the twelve (12) months prior to such time had, a business relationship, whether by contract or otherwise, to discontinue or alter in a manner adverse to the Company or any Subsidiary of the Company, such business relationship.[22]

Article XII of the Amended LLC Agreement includes restrictive covenants for a period of three years following the cessation of the managing member's employment, that is, the termination of Anguiano's employment with Plaintiff.[23]

### 2.   Anguiano's Promotion in April 2016

In April 2016, Anguiano received a promotion to Account Executive for Plaintiff's El Paso location—focusing on customers in El Paso, Texas; Ciudad Juarez, Mexico; and Santa Teresa, New Mexico.[24]  In connection with this promotion, he signed an employment agreement ("Employment Agreement"),[25] which contained a non-compete covenant, a non-solicitation

---

[22] *Id.* § 12.3(a)–(b).

[23] *Id.*

[24] App'x., "Declaration of Paul Anguiano" ("Anguiano Decl.") 2 ¶ 5.

[25] App'x, Employment Agreement, Ex. G.

covenant, and a confidentiality covenant for a period of three years following the cessation of his employment with Plaintiff.[26]

The Employment Agreement provides:

Section 1.   <u>In General</u>.   This Non-Competition, Non-Solicitation and Confidentiality Agreement (the "Agreement") is entered into by and between Paul Anguiano. ("Employee") and Material Handling Services, LLC, a Delaware limited liability company (together with all of its subsidiaries and affiliates, and their respective successors and assigns, the "Company"), as of April, 2016.

Section 2.   <u>Restrictive Covenants</u>
(a)   <u>Non-Compete</u>. Employee acknowledges that by virtue of his or her respective position with the Company, he or she has developed considerable expertise in the business of the Company.  During the Employee's termination of employment for any reason (the "Non-Competition Period"), the Employee shall not, without the prior written consent of the Company, and whether as employee, principal, agent, shareholders, partner, consultant, advisor, limited liability company manager or member, director, or otherwise, directly or indirectly, compete anywhere in North America or any other geographic location in which the Company engages in business or has taken active steps towards engaging in business as of the date of Employee's termination of employment, with the Company or any Affiliate (as defined herein) of the Company in the business of providing repair service, planned maintenance support, sales and installation, equipment modernization, diagnostics and analytics services for truck loading dock equipment commercial doors, recycling/waste handling equipment, material handling equipment, security and access control solutions, storefront glass systems to customers, and similar equipment and fixtures located at retail, distribution, manufacturing, healthcare and hospitality  companies or providing material handling equipment and fleet management and maintenance services, as conducted by the Company or any Affiliate of the Company, or in any other business activity directly related to the business in which the Company is now involved or becomes involved during the term of Employee's employment (the "Business"), nor will Employee engage in any other activities that conflict with his obligations to the Company. The making or guarantying of a loan, lease or any other financial arrangement to, with or for any person or entity that engages in any of the activities described in the preceding sentence shall be deemed . . .

(b)   <u>Non-Solicitation of Employees and Customers</u> During the Non-Competition Period, Employee will not, directly or indirectly, (i) recruit, provide services to, engage the services of, or otherwise solicit or induce any person, who is or who has been, within two years prior to that time, an employee, customer,

---

[26] *Id.* at § 2.

contractor, subcontractor, independent consultant, sales representative or supplier of the Company or any of its affiliates . . . to terminate its employment or arrangement with the Company or any of its affiliates . . . otherwise change its relationship with the Company or any of its affiliates . . . or establish any relationship with the Employee or any of his or her affiliates to compete with the Company or any of its affiliates in the Business or (ii) without the Company's prior written consent, hire or engage the services of (a) any employee of the Company or any of its affiliates . . . or (b) any person who has been, within two years prior to that time, an employee of the Company or any of its affiliates.

(d)    Confidentiality.  Employee shall, in perpetuity, maintain in confidence and shall not directly, indirectly or otherwise, use, disseminate, disclose or publish, or use for his benefit or the benefit of any person, firm, corporation or other entity any confidential or proprietary information or trade secrets of or relating to the Company, including, without limitation, information with respect to the Company's operations, processes, products, inventions, business practices, finances, principals, vendors, suppliers, customers, potential customers, marketing methods, costs, prices, contractual relations, regulatory status, compensation paid to employees or other terms of employment, or deliver to any person, firm, corporation or other entity any document, records, notebook, computer program or similar repository of or containing any such confidential or proprietary information or trade secrets . . . .[27]

### 3.    Anguiano's Separation from Plaintiff

Anguiano voluntarily left his employment with Plaintiff on January 3, 2017.[28]

Consequently, he signed a separation agreement, which included a non-disclosure provision and a provision requiring the return of company property.[29]

Following his separation, Anguiano started working with PDN as an independent contractor.[30]  Anguiano testified he solicited and sold to approximately eight customers of Plaintiff.[31]  According to Plaintiff, Anguiano took its "proprietary and confidential information

---

[27] Employment Agreement § 2.

[28] Anguiano Decl. 2 ¶ 8.

[29] App'x., Separation and Release Agreement ("Sep. Agreement") ¶¶ 4, 6, Ex. N.

[30] Anguiano Depo. 10:8–22.

[31] Id. at 18: 16–22, 27: 21–23, 91: 3–100: 10.

belonging to Miner, including a valuable pricing calculation sheet, which he converted to be used for PDN."[32]  Additionally, Plaintiff contends Anguiano solicited and recruited its employee, Juan Villegas, to work for PDN.[33]

Plaintiff seeks a preliminary injunction to: "(1) restrain Anguiano from soliciting Miner's clients, employees, and/or vendors; (2) restrain Defendants from [tortiously] interfering with Miner's existing contractual relations; (3) restrain Anguiano from disclosing and using Miner's Proprietary Information (including, but not limited to, its trade secrets); and
(4) require Anguiano to cooperate in Miner's investigation into his potential violation of state and federal privacy law."[34]

### B.      *Procedural Background*

On January 30, 2019, Plaintiff moved for a preliminary injunction and to expedite discovery in order to prepare for a hearing on the motion for a preliminary injunction.[35]  District Judge Orlando Garcia of the San Antonio Division granted Plaintiff's request for expedited discovery,[36] but vacated the order as Defendants had not yet been served with the complaint and summons.[37]  Following service on Defendants, Plaintiff again moved to expedite discovery.[38]

---

[32] "Plaintiff Miner Ltd.'s Supplemental Brief in Support of Renewed Motion for Preliminary Injunction" ("Supp.") 3, ECF No. 33, filed Apr. 29, 2019.

[33] *Id.* at 4.

[34] "Plaintiff Miner, Ltd.'s Renewed Motion for Preliminary Injunction" ("Mot.") 21, ECF No. 20, filed Mar. 8, 2019.

[35] "Plaintiff Miner, Ltd.'s Motion for Preliminary Injunction" 1, ECF No. 2, filed Jan. 30, 2019; "Motion for Expedited Discovery" 1, ECF No. 3, filed Jan. 30, 2019.

[36] "Order" 3, ECF No. 5, filed Feb. 1, 2019 (vacated).

[37] "Order" 2, ECF No. 6, filed Feb. 1, 2019.

[38] *See* "Plaintiff's Renewed Motion for Expedited Discovery" 1, ECF No. 11, filed Feb. 7, 2019.

Defendants then moved to transfer venue pursuant to 28 U.S.C. § 1404 and stay the proceedings until the case was transferred to the El Paso Division.[39] On March 7, 2019, Judge Garcia granted Defendant's motion to transfer venue,[40] explaining the parties reside in El Paso and the facts giving rise to the case occurred in El Paso.[41] In accordance with the transfer order, Judge Garcia denied as moot the following motions: "Plaintiff Miner, LTD.'s Motion for Preliminary Injunction" [ECF No. 2]; "Plaintiff's Renewed Motion for Expedited Discovery" [ECF No. 11]; and "Motion for Sanctions" [ECF No. 17].[42]

The case was assigned to this court. On March 8, 2019, Plaintiff refiled its motion for a preliminary injunction, its motion for a hearing on the motion for a preliminary injunction, and its motion to expedite discovery.[43] This court granted the motion for expedited discovery and ordered the parties to submit additional briefing prior to the hearing on the Motion.[44] A hearing on the Motion took place on May 17, 2019.[45]

---

[39] *See* "Defendants' Motion to Transfer Venue and Motion for Stay of Proceedings" 1, ECF No. 12, filed Feb. 8, 2019.

[40] "Transfer Order" 5, ECF No. 19, filed Mar. 7, 2019.

[41] *See id.* at 3–4.

[42] Defendants requested the court order Plaintiff "to cease attempting through email to the Court's Deputy to reargue motions already on file, to add allegations against Defendants, to infer dilatory actions by Defendants, or to try to tell the Court how to prioritize its docket." "Motion for Sanctions" 1, ECF No. 17, filed Mar. 4, 2019.

[43] *See generally* Mot.; "Motion for Hearing on Motion for Preliminary Injunction," ECF No. 22, filed Mar. 11, 2019; "Plaintiff's Second Renewed Motion for Expedited Discovery," ECF No. 21, filed Mar. 8, 2019.

[44] "Order Regarding Expedited Discovery" 6, ECF No. 25, filed Mar. 20, 2019.

[45] *See generally* "Preliminary Injunction Hearing Before the Honorable Frank Montalvo United States District Judge" ("Hearing Transcript"), ECF No. 47.

C.    *Parties' Arguments*

1.    Plaintiff's Arguments

Plaintiff claims it "has unequivocally established the acute need for a preliminary injunction."[46] According to Plaintiff, it is undisputed that PDN solicited Plaintiff's clients, misappropriated and used trade secrets, and took business from Plaintiff.[47] It contends this matter rests on the enforceability of restrictive covenants in the Amended LLC Agreement and Employment Agreement.[48]

Plaintiff asserts the restrictive covenants in the Amended LLC Agreement—which applies for a duration of three years following the termination of his employment—are reasonable and enforceable.[49] In support, it argues that (1) the Amended LLC Agreement was supported by consideration;[50] and (2) the restrictive covenants in the Amended LLC Agreement are reasonable and protect Plaintiff's "legitimate business interests."[51]

In the alternative, Plaintiff seeks to enforce the restrictive covenants in the Employment Agreement,[52] claiming the "restrictive covenants in Anguiano's employment agreement are also ancillary to an otherwise enforceable agreement supported by consideration."[53] It also asserts

---

[46] Supp. 7.

[47] *Id.* at 8.

[48] *Id.*

[49] *Id.* at 9.

[50] *Id.* at 9.

[51] *Id.* at 12.

[52] Supp. at 14.

[53] *Id.* at 14.

11

that the restrictive covenants in the Employment Agreement are reasonable in duration, geography, and scope of activity.[54]

Plaintiff asserts the court should reform the restrictive covenants in the Amended LLC Agreement or the Employment Agreement as appropriate in the event the court determines the restrictive covenants are overbroad.[55]  In addition, Plaintiff argues Anguiano should be enjoined from using confidential and proprietary information obtained during his employment with Plaintiff, as consistent with enforceable confidentiality provisions of the Amended LLC Agreement and Employment Agreement.[56]

Lastly, Plaintiff asserts Anguiano violated the DTSA and TUTSA when he accessed and transmitted trade secrets to personal devices and used these trade secrets to gain an unfair competitive advantage.[57]  Specifically, Plaintiff points to a customer list, pricing information, client information, and "valuable know how and knowledge that Anguiano gained as president of Miner El Paso."[58]

### 2.     Defendants' Arguments

In opposition, Defendants argue Anguiano did not violate the restrictive covenants, claiming there are no enforceable restrictive covenants.[59]  If the Amended LLC Agreement is enforceable, Defendants contend the Subscription Agreement prevails in the event there is a

---

[54] *Id.* at 15.

[55] *Id.* at 16–17.

[56] *Id.* at 18–19.

[57] *Id.* at 20.

[58] Supp. at 20.

[59] Defendants' Response to Plaintiff's Renewed Motion for Preliminary Injunction" ("Resp.") 2, ECF No. 37, filed May 6, 2019.

conflict with the terms of the Amended LLC Agreement.[60]  Therefore, they contend the

Subscription Agreement is controlling, and the restricted period under the Subscription

Agreement expired two years following the date of sale.[61]  Thus, Defendants argue, the

restrictive covenants in the Amended LLC Agreement would be of no effect.[62]

Defendants also assert that the Employment Agreement is unenforceable under Texas law

as it is (1) devoid of any consideration; and (2) unreasonable in time, scope, and geography.[63]

Additionally, they claim that Plaintiff's allegations of computer fraud and trade secret theft are

without merit.[64]  According to Defendants, the alleged confidential information—including the

quote sheet, Excel calculator, and customer list—is not confidential, as Plaintiff's procedures to

protect the alleged confidential information are "woefully inadequate."[65]

## II.    LEGAL STANDARD

A preliminary injunction "is an extraordinary and drastic remedy, not to be granted

routinely, but only when the movant, by a clear showing, carries the burden of persuasion."[66]

In order to prevail on a motion for a preliminary injunction, the movant must clearly establish:

> (1) a substantial likelihood that he will prevail on the merits, (2) a substantial threat
> that he will suffer irreparable injury if the injunction is not granted, (3) his
> threatened injury outweighs the threatened harm to the party whom he seeks to

---

[60] *Id.* at 4.

[61] *Id.*

[62] *Id.*

[63] *Id.* at 7.

[64] *See id.* at 11–20.

[65] Resp. 15.

[66] *White v. Carlucci*, 862 F.2d 1209, 1211 (5th Cir. 1989) (quoting *Holland Am. Ins. Co. v. Succession of Roy*, 777 F.2d 992, 997 (5th Cir. 1985)).

enjoin, and (4) granting the preliminary injunction will not disserve the public interest.[67]

A movant need not prove it is entitled to summary judgment in order to show a likelihood of success.[68] Rather, the movant must present a *prima face* case.[69]

If the movant fails to carry its burden on any one of the four elements, the court must deny the request for preliminary injunctive relief.[70] Even when the movant carries its burden of persuasion on all four elements, the decision to grant or deny relief is left to the sound discretion of the district court.[71] A movant who obtains a preliminary injunction must post a bond to secure the non-movant against any wrongful damages it suffers as a result of the injunction.[72]

## III.   DISCUSSION

    *A.     Substantial Likelihood of Success on the Merits*

        1.     Enforceability of Restrictive Covenants in the Employment Agreement

            *a.     Non-Compete Covenant*

Plaintiff seeks to enforce the Employment Agreement, entered into on April 29, 2016.[73] The Employment Agreement contains a non-compete covenant, a non-solicitation of employees and customers covenant, and a confidentiality provision.[74] Defendants argue the non-compete

---

[67] *Google, Inc. v. Hood*, 822 F.3d 212, 220 (5th Cir. 2016).

[68] *Daniels Health Scis., L.L.C. v. Vascular Health Scis., L.L.C.*, 710 F.3d 579, 582 (5th Cir. 2013).

[69] *Id.*

[70] *Holland*, 777 F.2d at 997.

[71] *Miss. Power & Light Co. v. United Gas Pipe Line Co.*, 760 F.2d 618, 621 (5th Cir. 1985).

[72] *See* FED. R. CIV. P. 65(c).

[73] Supp. 14.

[74] Employment Agreement § 2.

14

covenant is "wholly unenforceable" under Texas law, as it (1) lacks consideration; and (2) is

unreasonable in time, scope, and geography.[75]

Texas Business and Commerce Code § 15.50 ("Section 15.50") governs the

enforceability of non-compete covenants.[76]  It provides:

> [A] covenant not to compete is enforceable if it is ancillary to or part of an otherwise
> enforceable agreement at the time the agreement is made to the extent that it
> contains limitations as to time, geographical area, and scope of activity to be
> restrained that are reasonable and do not impose a greater restraint than is necessary
> to protect the goodwill or other business interest of the promisee.[77]

Accordingly, the court must address whether Plaintiff has satisfactorily shown (1) the

restrictive covenant is "ancillary to or part of an otherwise enforceable agreement; and

(2) the restrictions are reasonable.[78]

i.     *Ancillary to or Part of an Otherwise Enforceable*
       *Agreement*

Covenants that place limits on former employees' professional mobility or restrict their

solicitation of the former employers' customers and employees are restraints on trade.[79]  "In the

two-step threshold inquiry to determine if a covenant is enforceable under the Act, we determine

whether there is an 'otherwise enforceable agreement' between the parties, and, if so, we

determine whether the covenant is 'ancillary to or part of' that agreement."[80]  There is an

---

[75] Resp. at 9, 12.

[76] TEX. BUS. & COM. CODE § 15.50.

[77] *Id.*

[78] *Id.*

[79] *Marsh USA Inc. v. Cook*, 354 S.W.3d 764, 768 (Tex. 2011).

[80] TEX. BUS. & COM. CODE § 15.50(a); *Marsh USA Inc.*, 354 S.W.3d at 773 (quoting *Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding*, 289 S.W.3d 844, 849 (Tex. 2009)). "The enforceability of a covenant not to compete is a question of law." *Fielding*, 289 S.W.3d at 848.

"otherwise enforceable agreement" where the covenant is "part of an agreement that contained mutual non-illusory promises."[81]

Defendants argue the Employment Agreement lacks consideration.[82] To be valid and enforceable, a contract must include consideration, that is, a mutuality of obligation.[83] At-will employment is insufficient consideration to support a non-compete covenant under Texas law.[84] The Texas Supreme Court has explained that "[t]he covenant cannot be a stand-alone promise from the employee lacking any new consideration from the employer."[85]

Texas courts have regularly found there is an enforceable agreement supporting a non-compete covenant where an employer promises to provide an employee with confidential information and the employee promises not to disclose such confidential information.[86] In *Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding*,[87] a certified public accountant signed a non-compete agreement, expressly promising not to disclose confidential information, including

---

[81] *Marsh USA, Inc.*, 354 S.W.3d at 773 (citing *Alex Sheshunoff Mgmt. Servs., L.P. v. Johnson*, 209 S.W.3d 644, 648–49 (Tex. 2006)).

[82] Resp. 7.

[83] *Fed. Sign v. Tex. S. Univ.*, 951 S.W.2d 401, 408 (Tex. 1997), *abrogated on other grounds, Gen. Servs. Comm'n v. Little–Tex Insulation Co., Inc.*, 39 S.W.3d 591, 593 (Tex. 2001).

[84] *Hunn v. Dan Wilson Homes, Inc.*, 789 F.3d 573, 584 (5th Cir. 2015).

[85] *Sheshunoff*, 209 S.W.3d at 651.

[86] *Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding*, 289 S.W.3d 844, 850–51 (Tex. 2009) (finding requirement satisfied where employee expressly promised not to disclose confidential information and the employer impliedly promised to provide confidential information by the nature of employee's work as a certified public accountant); *Sheshunoff*, 209 S.W.3d 644 ("a unilateral contract formed when the employer performs a promise that illusory when made can satisfy the requirements"); *Light v. Centel Cellular Co. of Tex.*, 883 S.W.2d 642, 644 (Tex. 1994), *abrogated by Marsh*, 354 S.W.3d 764 ("If, however, the employer accepts the employee's offer [by disclosing trade secrets], a unilateral contract is created in which the employee is now bound by [his] promise."); *see also Hunn v. Dan Wilson Homes, Inc.*, 789 F.3d 573, 584–85 (5th Cir. 2015).

[87] 289 S.W.3d 844 (Tex. 2009).

"clients' names, billing information, and pertinent tax and financial information."[88]  Notably, the agreement did not include an express return promise by the employer to provide the employee with confidential information.[89]  The Texas Supreme Court nevertheless upheld the non-compete covenant, reasoning:

> [I]f the nature of the employment for which the employee is hired will reasonably require the employer to provide confidential information to the employee for the employee to accomplish the contemplated job duties, then the employer impliedly promises to provide confidential information and the covenant is enforceable so long as the other requirements of the Covenant Not to Compete Act are satisfied.[90]

Courts may imply a return promise where one party's express promise "cannot reasonably be performed absent some type of performance by the other party."[91]  The Texas Supreme Court concluded the employer in *Fielding* made an implied promise to supply the employee with confidential information necessary to carry out his promise to refrain from disclosing confidential information.[92]  Furthermore, it found that the employer gave the certified public accountant confidential information, such as client names, personal financial information, and social security numbers.[93]  Therefore, the parties formed an "otherwise enforceable agreement"

---

[88] *Id.* at 851.

[89] *Id.* at 850.

[90] *Id.* at 845–46.

[91] *Id.* at 850; *see also McKissock, LLC v. Martin*, 267 F. Supp. 3d 841, 854 (W.D. Tex. 2016) (concluding employer made an implied promise to disclose confidential information where a confidentiality agreement provided that trade secrets may be disclosed to the employee); *Gallagher Healthcare Ins. Servs. v. Vogelsang*, 312 S.W.3d 640, 649–50 (Tex. App.—Houston [1st Dist.] 2009) (holding the employer made an implied promise to give the employee—an insurance broker—confidential information).

[92] *Fielding*, 289 S.W.3d at 851–52.

[93] *Id.* at 852.

when the employer "performed its illusory promise by actually providing confidential information."[94]

In the Employment Agreement's confidentiality covenant, Anguiano expressly promised "to maintain in confidence and . . . not . . . use, disseminate, disclose or publish . . . any confidential or proprietary information or trade secrets . . . ."[95]  Although Anguiano made an express promise to keep information confidential, Plaintiff did not.[96]  As explained in *Fielding*, this court infers Plaintiff made an implied promise to supply Anguiano with confidential information.

This implied promise was illusory unless Plaintiff performed by providing Anguiano with confidential information.[97]  Plaintiff asserts that Anguiano, as an Account Executive, was privy to confidential information because the confidential information is required "for the work to be performed."[98]  At the hearing, Plaintiff asserted that "the confidential information includes things like business strategy, where are we going, pricing information, margins."[99]

Plaintiff has not persuaded this court that this case involved the dissemination of "confidential information."  In *DeSantis v. Wackenhut Corporation*,[100] the Texas Supreme Court rejected the plaintiff's claim that its supposed confidential information—the identity of their

---

[94] *Id.*

[95] Employment Agreement § 2(d).

[96] *See generally id.*

[97] *Fielding*, 289 S.W.3d at 852 (holding the parties form an "otherwise enforceable agreement" when the employer performs its illusory promise by actually providing confidential information).

[98] Hearing Transcript 16: 13–18, ECF No. 47.

[99] *Id.* at 17: 4–6.

[100] 793 S.W.2d 670 (Tex. 1990).

customers, pricing policies, cost factors, and bidding strategies—was protectable under the confidentiality agreement.[101]  It explained that the plaintiff "failed to show that its customers could not readily be identified by someone outside its employ, that such knowledge carried some competitive advantage, or that its customers' needs could not be ascertained simply by inquiry addressed to those customers themselves."[102]  Additionally, the Texas Supreme Court noted the plaintiff "failed to show that its pricing policies and bidding strategies were uniquely developed, or that information about its prices and bids could not, again, be obtained from the customers themselves."[103]

Like *Wackenhut*, Plaintiff has not shown its business practices, pricing, margin, or strategy were uniquely developed or not readily accessible.  Furthermore, Plaintiff's alleged "confidential information" is vague at best.  Plaintiff struggles to identify and expand upon the alleged confidential information.  The court will not infer a fact into existence.  The Employment Agreement lacks consideration and is unenforceable.

Accordingly, Plaintiff has not established the Employment Agreement is enforceable to warrant preliminary injunctive relief.

> 2.     The Subscription Agreement and Amended LLC Agreement

Alternatively, Plaintiff argues restrictive covenants in the Amended LLC Agreement are binding on Anguiano.[104]  Section 12.3 of the Amended LLC Agreement, titled "Post

---

[101] *Id.* at 684.

[102] *Id.*

[103] *Id.*

[104] Supp. 9.

Employment," contains non-compete covenant and non-solicitation covenants.[105]   The court

must address whether Plaintiff has satisfactorily shown: (1) the restrictive covenants are

"ancillary to or part of an otherwise enforceable agreement; and (2) the restrictions are

reasonable.[106]

*a.*     *Enforceability of the Non-Compete Covenant*

*i.*     <u>*Ancillary to or Part of an Otherwise Enforceable*</u>
<u>*Agreement*</u>

Plaintiff asserts the restrictive covenants in the Amended LLC Agreement are binding on

Anguiano, as they are supported by consideration and are reasonable in scope.[107]  "In the two-

step threshold inquiry to determine if a covenant is enforceable under the Act, we determine

whether there is an 'otherwise enforceable agreement' between the parties, and, if so, we

determine whether the covenant is 'ancillary to or part of' that agreement."[108]

There is an "otherwise enforceable agreement" where the covenant is "part of an

agreement that contained mutual non-illusory promises."[109]  "Such a restraint on competition is

unreasonable unless it is part of and subsidiary to an otherwise valid transaction or relationship

which gives rise to an interest worthy of protection."[110]  Here, the Amended LLC Agreement is

supported by consideration.  In exchange for receiving a membership interest and stock in

---

[105] Am. LLC Agreement 12.3.

[106] TEX. BUS. & COM. CODE § 15.50.

[107] Supp. 9, 12.

[108] TEX. BUS. & COM. CODE § 15.50(a); *Marsh USA Inc. v. Cook*, 354 S.W.3d 764, 773 (Tex. 2011) (quoting *Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding*, 289 S.W.3d 844, 849 (Tex. 2009)). "The enforceability of a covenant not to compete is a question of law." *Fielding*, 289 S.W.3d at 848.

[109] *Marsh USA*, 354 S.W.3d at 773 (internal quotation marks omitted) (quoting *Alex Sheshunoff Mgmt. Servs., L.P. v. Johnson*, 209 S.W.3d 644, 648–49 (Tex. 2006)).

[110] *DeSantis v. Wackenhut Corp.*, 793 S.W.2d 670, 682 (Tex. 1990).

Plaintiff's subsidiary in El Paso, Anguiano agreed to be bound to the terms of the Amended LLC Agreement, including the non-compete and non-solicitation covenants.[111]  Plaintiff has satisfactorily shown the restrictive covenants are ancillary to or part of an otherwise enforceable agreement.

<i>ii.    Interpretation</i>

Although the Amended LLC Agreement is a valid agreement containing restrictive covenants, the parties dispute the interpretation of the contract—particularly, the duration of the non-compete and non-solicitation period.[112]  Section 12.3 of the Amended LLC Agreement contains the restrictive covenants and governs the applicable time period of the restrictive covenants.[113]  It provides:

> "Each Management Member further agrees that, for a period of three (3) years (or such other period as may be specified in the Subscription Agreement or Profits Interest Award Agreement relating to such Management Member) after the cessation or termination of his or her employment . . . ."[114]

Plaintiff interprets the non-compete provision as applicable for a period of three years following Anguiano's separation from Plaintiff.[115]  Defendants contest this understanding, pointing out the contractual language states: "*(or such other period as may be specified in the Subscription Agreement or Profits Interest Award Agreement relating to such Management Member).*"[116]  According to Defendants, the period specified in the Subscription Agreement

---

[111] *See generally* Am. LLC Agreement.

[112] Supp. 15; Resp. 2.

[113] Am. LLC Agreement § 12.3.

[114] Am. LLC Agreement § 12.3(a).

[115] Supp. 9.

[116] Resp. 2–3 (citing Am. LLC Agreement 12.3(a)) (emphasis added).

21

would therefore control the duration—and consequently the expiration—of the restrictive covenants.

Importantly, Section 1.4 of the Subscription Agreement provides that the purchaser is subject to the non-competition and non-solicitation covenants "[f]or a period set forth next to the name of such Purchaser or Non-Purchaser Stockholder on Appendix A hereto commencing on the date of the Closing . . . ."[117] Appendix A of the Subscription Agreement lists Anguiano's non-compete period as two years.[118] This would mean that the Subscription Agreement's terms—two years following the closing—would control in the case of a conflict with the Amended LLC Agreement.

The interpretation of the contract hinges on the use of the word "or": "for a period of three (3) years (*or such other period as may be specified in the Subscription Agreement or Profits Interest Award Agreement relating to such Management Member*)."[119] "When the interpretation of a contract is in issue, the trial court must first determine whether the provisions in question are ambiguous."[120] "Whether a contract is ambiguous is a question of law that must be decided by examining the contract as a whole in light of the circumstances present when the contract was entered."[121] Mere disagreement among the parties does not amount to ambiguity in the

---

[117] Subscription Agreement § 1.4.

[118] Subscription Agreement, Appx. A.

[119] Subscription Agreement § 1.4.

[120] *Nicol v. Gonzales*, 127 S.W.3d 390, 394 (Tex. App.—Dallas 2004) (citing *Coker v. Coker*, 650 S.W.2d 391, 394 (Tex. 1983)).

[121] *Universal Health Servs., Inc. v. Renaissance Women's Group, P.A.*, 121 S.W.3d 742, 746 (Tex. 2003) (citing *Columbia Gas Transmission Corp. v. New Ulm Gas, Ltd.*, 940 S.W.2d 587, 589 (Tex. 1996) (internal quotation marks omitted); *see also Apache Deepwater, LLC v. McDaniel Partners, Ltd.*, 485 S.W.3d 900, 906 (Tex. 2016) ("We 'examine and consider the entire writing in an effort to harmonize and give effect to all the provisions of the contract so that none will be rendered meaningless.'").

contract.[122] "Rather, an ambiguity arises when an agreement is susceptible to more than one reasonable meaning after application of established rules of construction."[123]

Accordingly, the court must evaluate the meaning of "or." "Language used by parties in a contract should be accorded its plain, grammatical meaning unless it definitely appears that the intention of the parties would thereby be defeated."[124] As the Court of Appeals of Texas in El Paso has reasoned, "[I]n its disjunctive nature, 'or' expresses a choice between two mutually exclusive possibilities."[125] Here, the use of "or" in this contractual language signifies two options—either a period of three years *or* a period specified in the Subscription Agreement.

At first glance, the language in the Amended LLC Agreement appears ambiguous. At this preliminary stage of litigation, the court declines to rule as a matter of law on the applicable non-compete duration. In light of the multiple agreements before this court, the limited expedited discovery period, and continuing discovery, the court finds it in the interest of justice to resolve this matter of contractual interpretation at the summary judgment stage of litigation. This will permit the court to consider the multiple agreements in this case—all of which contain restrictive covenants—following the full development of the record and the completion of discovery.

The court finds Plaintiff has established a prima facie case of an enforceable non-compete covenant. While the issue of the duration of the restrictive covenant remains unsettled,

---

[122] *Kachina Pipeline Co., Inc. v. Lillis*, 471 S.W.3d 445, 450 (Tex. 2015).

[123] *Universal Health Servs., Inc.*, 121 S.W.3d at 746.

[124] *Lyons v. Montgomery*, 701 S.W.2d 641, 643 (Tex. 1985).

[125] *Comm. Bank of Raymore v. Chesapeake Exploration, L.L.C.*, 416 S.W.3d 750, 755 (Tex. App.—El Paso 2013).

the court may progress to the next consideration: whether the restraints in the restrictive covenant are consistent with Texas law.

### iii.     *Reasonableness of Restrictions*

A non-compete covenant is in restraint of trade and therefore unenforceable on public policy grounds unless it is reasonable.[126]  Texas Business and Commerce Code § 15.51 provides:

> If the covenant is found to be ancillary to or part of an otherwise enforceable agreement but contains limitations as to time, geographical area, or scope of activity to be restrained that are not reasonable and impose a greater restraint than is necessary to protect the goodwill or other business interest of the promisee, the court shall reform the covenant to the extent necessary to cause the limitations contained in the covenant as to time, geographical area, and scope of activity to be restrained to be reasonable and to impose a restraint that is not greater than necessary to protect the goodwill or other business interest of the promisee and enforce the covenant as reformed . . . .[127]

The restraint "must not be greater than necessary to protect the promissee's legitimate interest."[128]  Accordingly, the restrictions in a non-compete covenant—geographic restrictions, duration, and scope—must all be reasonable.[129]

Plaintiff requests the court "enjoin Defendants from competing with Miner in the exact regions where Anguiano regularly used Miner pricing information and strategy."[130]  Specifically, Plaintiff proposes a geographic region covering most of New Mexico and a substantial amount of counties in Western Texas, as well as the country of Mexico.[131]  Defendants propose that

---

[126] *DeSantis v. Wackenhut Corp.*, 793 S.W. 670, 681 (Tex. 1990).

[127] TEX. BUS. & COM. CODE § 15.51(c).

[128] *DeSantis*, 793 S.W.2d at 682 (citing *Henshaw v. Kroenecke*, 656 S.W.2d 416, 418 (Tex. 1983)).

[129] TEX. BUS. & COM. CODE § 15.50(a); *DeSantis*, 793 S.W.2d at 682 ("The extent of the agreement not to compete must accordingly be limited appropriately as to time, territory, and type of activity").

[130] "Plaintiff Miner, Ltd.'s Supplemental Post-Hearing Brief" ("Post-Hearing Brief") 5, ECF No. 45, filed May 22, 2019.

[131] "Preliminary Injunction Order," ECF No. 43, filed May 21, 2019 (proposed order).

Anguiano be restricted from "[e]ngaging in the business of selling and providing loading dock and material handling equipment parts and services within 25 miles of El Paso, Texas, measured from the intersection of Kansas Street and Texas Avenue, El Paso, Texas 79901."[132]

After consideration of the multiple competing agreements, the expedited discovery period, and the remaining unsettled issues of law, the court believes a cautious approach is most appropriate until a later judgment on the merits. Accordingly, the court restricts the geographic scope of the non-compete covenant to El Paso County, Texas and the country of Mexico.

### b.    *Enforceability of Non-Solicitation Covenants*

Like the non-compete covenant, the non-solicitation covenants are only valid if they are ancillary to or part of an otherwise enforceable agreement. As determined above, the restrictive covenants are ancillary to an otherwise enforceable agreement. With respect to the reasonableness of the non-solicitation covenant, the court finds it reasonable to the extent it prohibits PDN from soliciting clients Anguiano served while an employee of Plaintiff.

### 3.    Trade Secrets

Plaintiff further seeks to restrain Defendants from using its trade secrets.[133] Plaintiff claims Anguiano misappropriated a sales quote sheet, an Excel calculator, a client list, and know-how acquired while employed by Plaintiff.[134] Plaintiff contends that, absent injunctive relief, Defendants will continue to cause it irreparable harm through the prolonged use of trade

---

[132] "Defendants' Notice of Submission of Proposed Preliminary Injunction, ECF No. 44, filed May 21, 2019, "Preliminary Injunction," ECF No. 44-1 (proposed order).

[133] Mot. 17 ("restrain Anguiano from disclosing and using Miner's Proprietary Information (including, but not limited to, its trade secrets").

[134] Resp. at 11-12. In their Response, Defendants identify Plaintiff's alleged trade secrets as a sales quote sheet, an Excel calculator, a client list, and know-how. Plaintiff does not dispute this identification of the alleged trade secrets.

secrets.[135]  Defendants argue the aforementioned documents and information are not trade

secrets.[136]  The court agrees.

TUTSA defines trade secrets and misappropriation of trade secrets.[137]  These definitions

are identical to those in TUTSA's federal counterpart—the DTSA.[138]  To show a party

misappropriated a trade secret, the plaintiff must establish: (1) the information is a trade secret;

(2) the defendant acquired the secret through improper means; and (3) the defendant's use of the

secret resulted in harm to the plaintiff.[139]  The owner must take "reasonable measures to keep

such information secret" and the information must "derive[] independent economic value" from

remaining secret.[140]  Once these two criteria are met, "all forms and types of information,"

including any "program . . . method . . . technique . . . financial data, or list of actual or potential

customers" are classified as trade secrets.[141]

A party can misappropriate a trade secret in two ways.  Under one avenue, a party

misappropriates a trade secret if she knows or has reason to know the trade secret was acquired

---

[135] Mot. at 2.

[136] Resp. 14-18.

[137] TEX. CIV. PRAC. & REM. CODE § 134A.002.

[138] 18 U.S.C. § 1839.

[139] *See Trilogy Software, Inc. v. Callidus Software, Inc.*, 143 S.W.3d 452, 463 (Tex. App.—Austin 2004). The Texas Uniform Trade Secret Act provides for injunctive relief as well as damages. TEX. CIV. PRAC. & REM. CODE § 134A.003.

[140] TEX. CIV. PRAC. & REM. CODE § 134A.002(6)(A)-(B).  The quoted portions are *verbatim* in 18 U.S.C. § 1839(3)(A)-(B).

[141] TEX. CIV. PRAC. & REM. CODE § 134A.002(5).  The provision in the DTSA is relevantly similar: "the term 'trade secret' means all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing." 18 U.S.C. § 1839(3).

through improper means."[142]  Improper means include "theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, to limit use, or to prohibit discovery of a trade secret."[143]  A party also misappropriates a trade secret if she discloses information without the owner's consent and either "used improper means to acquire knowledge of the trade secret" or "knew or had reason to know" that her knowledge of the trade secret derived from someone who misappropriated the trade secret.[144]

### a.  Whether the Information is a Trade Secret

Once a court determines the information existed, the court must evaluate whether the information is a trade secret.[145]  In *In re Bass*,[146] the Texas Supreme Court enumerated six factors that bear on whether information constitutes a trade secret:

> (1) the extent to which the information is known outside of his business;
> (2) the extent to which it is known by employees and others involved in his business;
> (3) the extent of the measures taken by him to guard the secrecy of the information;
> (4) the value of the information to him and to his competitors;
> (5) the amount of effort or money expended by him in developing the information; [and]
> (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.[147]

---

[142] TEX. CIV. PRAC. & REM. CODE § 134A.002(3)(A); 18 U.S.C. § 1839(5)(A).

[143] TEX. CIV. PRAC. & REM. CODE ANN. § 134A.002(2).  The definition in the DTSA is the same except it omits "to limit use, or to prohibit discovery of a trade secret." 18 U.S.C. § 1839(6)

[144] A person misappropriates a trade secret if she used improper means to acquire the knowledge, owed the party seeking relief a duty to keep the information secret, or acquire the secret "under circumstances giving rise to a duty to maintain the secrecy…of the trade secret."  TEX. CIV. PRAC. & REM. CODE § 134A.002(3)(B); 18 U.S.C. § 1839(5)(B).

[145] *In re Bass*, 113 S.W.3d 735, 739 (Tex. 2003).

[146] 113 S.W.3d 735 (Tex. 2003).

[147] *Id.* at 739.

A party need not satisfy all six factors.[148]

### i.   *Excel Calculator*

Plaintiff alleges Anguiano misappropriated an Excel calculator containing formulas used to calculate profit margins.[149]  Defendants contend the Excel calculator is merely an Excel spreadsheet that does not contain any additional information.[150]  At the hearing, Defendants elaborated:

> [T]he margins aren't calculated by the calculator until the data is put in.  So until all the pricing information, intended and expected profit margins, until those data fields are populated, that calculator doesn't do anything.  It just sits there.[151]

Information is valuable when it provides the competitor details about a product or service that give them a competitive advantage.[152]  In the present case, the record is devoid of any evidence that the Excel calculator contained any information worthy of trade-secret protection. Plaintiff merely offers conclusory statements.  The court will not infer an existence of confidential information within the Excel calculator.

Additionally, Plaintiff has not shown it expended considerable money and effort developing the information.  Although Plaintiff contends it took sufficient security precautions and the alleged information was not readily accessible, it has not persuaded this court that the Excel calculator actually contained any protected information.  Without the existence of information worthy of trade-secret protection, security measures and lack of accessibility are

---

[148] *Id.* at 740.

[149] Supp. 18–19.

[150] Hearing Transcript 30: 12–14 ("The Excel calculator is, in fact, an Excel spreadsheet.  It's not like an Excel spreadsheet.  It is an Excel spreadsheet.").

[151] *Id.* at 30: 16–21.

[152] *In re Cooper Tire & Rubber Co.*, 313 S.W.3d 910, 918 (Tex. App—Houston [14th Dist.] 2010).

inapposite.  Moreover, Plaintiff's representative concedes the price quotes could be computed by pencil and paper.[153]

After a consideration of the *Bass* factors, the court finds Plaintiff has failed to establish a *prima facie* case that the Excel calculator qualifies as a trade secret.

### ii. Sales Quote Sheet

Additionally, Plaintiff has not persuaded this court that the sales quote sheet constitutes a trade secret.  First, the quote sheet is reasonably well-known, as it is available in the public domain.[154]  A quote sheet "with nearly identical information fields" could be downloaded from the internet.[155]  Moreover, the record is devoid of evidence showing the quote sheet contains any information not publicly available.[156]

Secondly, the sales quote sheet was widely accessible.  Plaintiff's employees used the quote sheet to provide cost information to customers.  As it was widely accessed by Plaintiff's employees and clients, there were no limitations on who could obtain the information.[157]  Likewise, Plaintiff took no precautions to safeguard its price quote sheets.  Indeed, it routinely handed the sheets to customers.[158]  Plaintiff never required the recipients to keep the sales quote sheets confidential.[159]

---

[153] Resp. 17.

[154] *Id.* at 16.

[155] *Id.*

[156] See *Sharma v. Vinmar Int'l, Ltd.*, 231 S.W.3d 405, 425 (Tex. App—Houston [14th Dist.] 2007), for an example of information not available to the public; the plaintiff's documents were trade secrets, as they contained "trend information about [the plaintiff's] customers' demands" that was not available to the public.

[157] *See, e.g.,* Resp., "Oral Deposition of Ricardo Velasco, Jr." ("Velasco Depo.") 22: 9-15, Ex. B.

[158] Resp. 16.

[159] *Id.*

Nor has Plaintiff shown the sales quote sheet contains any valuable information.[160] It was merely a generic template used to inform clients about their purchase. In fact, PDN eventually created its own to replace Plaintiff's quote sheet.[161] In addition, Plaintiff has not shown it expended substantial resources in creating the quote sheet.[162]

After careful consideration, the court finds Plaintiff has not established the sales quote sheet qualifies as a trade secret.

*iii.*     *General Know-How and Customer List*

Plaintiff contends Anguiano misappropriated a customer list and "know[-]how" he acquired during his employment with Plaintiff.[163] Neither the client list nor Anguiano's know-how is a trade secret. First and foremost, Plaintiff has not produced a customer list, and it is not clear the list ever existed. Plaintiff also admits that Anguiano could have compiled a list of his clients from memory.[164] Thus, Plaintiff has not demonstrated that the client list ever existed, much less that it constituted a trade secret.

Second, "[m]atters of general knowledge in an industry" are not trade secrets.[165] Plaintiff has not described the know-how Anguiano allegedly misappropriated in sufficient detail to

---

[160] *See In re Bass*, 113 S.W.3d 735, 739 (Tex. 2003).

[161] Anguiano Depo. 67:4-16.

[162] *See In re Cooper & Rubber Co.*, 313 S.W.3d 910, 918 (2010) (finding that a plaintiff's inability to provide a dollar amount for how much money went into developing information counts against them on the fifth factor).

[163] Compl. 14 ¶ 44.

[164] Anguiano Depo. 81:4-83:9.

[165] *McClain v. State*, 269 S.W.3d 191, 197 (Tex. App.—Texarkana 2008).

30

differentiate it from "*general* knowledge, skill, and experience acquired in former employment."[166]  Therefore, Anguiano's general know-how is not a trade secret.

As Plaintiff has not pointed to any information entitled to trade-secret protection, the court need not address whether Anguiano acquired the secret through improper means and whether the use of the secret resulted in harm.  In sum, Plaintiff has failed to show the documents, if any, contained information entitled to trade-secret protection.

Plaintiff has demonstrated a likelihood of success on the merits of the enforceability of the restrictive covenants in the Amended LLC Agreement.

### B.    *Irreparable Harm*

A plaintiff seeking preliminary injunctive relief must demonstrate irreparable injury is likely in absence of an injunction.[167]  To demonstrate threat of an irreparable injury, the plaintiff must show "a significant threat of injury from the impending action, that the injury is imminent, and that money damages would not fully repair the harm."[168]  "In Texas, injury resulting from the breach of non-compete is the epitome of irreparable injury, so enforcement appears to be the rule rather than the exception."[169]  Sister courts have concluded that the use of an employer's confidential information and possible loss of customers is sufficient to show irreparable harm.[170]

---

[166] *See Zep Mfg. Co. v. Harthcock*, 824 S.W.2d 654, 663 (Tex. App—Dallas 1992); *see also Kewanee Oil Co. v. Bicron Corp.*, 416 U.S. 470, 475 (1974) (indicating knowledge must be more than merely "general knowledge in the trade or business" to be a trade secret).

[167] *Winter v. Nat. Res. Defense Council, Inc.*, 555 U.S. 7, 21–23 (2008).

[168] *Humana, Inc. v. Jacobson*, 804 F.2d 1390, 1394 (5th Cir. 1986).

[169] *McKissock, LLC v. Martin*, 267 F. Supp. 3d 841, 858 (W.D. Tex. 2016) (quoting *Sirius Compt. Sols., Inc. v. Sparks*, 138 F. Supp. 3d 821, 841 (W.D. Tex. 2015)); *see also Cardinal Health Staffing Network, Inc. v. Bowen*, 106 S.W.3d 230, 236 (Tex. App.—Houston [1st Dist.] 2003).

[170] *McKissock*, 267 F. Supp. 3d at 858–59 (W.D. Tex. 2016); *TransPerfect Translations, Inc. v. Leslie*, 594 F. Supp. 2d 742, 757 (S.D. Tex. 2009).

Anguiano testified that PDN "basically" does "the same type of service" as Miner.[171] Anguiano also stated he sold to Miner customers on behalf of PDN.[172]  Miner contends it "has seen a decrease in projected revenue for 2019" for 20 out of 38 Miner clients.[173]

The court finds Miner has shown sufficient potential for irreparable injury at this preliminary stage.

C.    *Balancing of Harms*

Next, the court must balance the potential harm to Plaintiff with the hardship to Defendants if an injunction is not issued.[174]  Permitting a former employee to compete in the relevant geographic area and solicit the former employer's customers would result in Plaintiff "facing a substantial risk of losing customers it otherwise would have had and an erosion of its goodwill, losses that are difficult or impossible to quantify by monetary damages."[175]  If Anguiano were to continue to compete in the relevant geographic area and solicit Plaintiff's customers, there is potential risk of reputational harm to Plaintiff's business interests and financial harm.  Accordingly, this factor is satisfied.

---

[171] Anguiano Depo. 18:5–7.

[172] *Id.* at 18:16–19 (stating he sold to "probably about eight" Miner customers).

[173] Post-Hearing Brief 3.

[174] *See Valley v. Rapides Parish School Bd.*, 118 F.3d 1047, 1056 (5th Cir. 1997).

[175] *Daily Instruments Corp. v. Heidt*, 998 F. Supp. 3d 553, 571 (S.D. Tex. 2014); *see also Am. Exp. Fin. Advisors, Inc. v. Scott*, 955 F. Supp. 688, 693 (N.D. Tex. 1996) (holding the hardships to a signatory to a non-compete from the preliminary injunction do not outweigh those to the company if the signatory were allowed to violate his non-compete and work with former clients for the period covered in the agreement).

*D.    Public Interest*

Finally, the court considers whether granting the preliminary injunction will not disserve

the public interest.[176] The Fifth Circuit and Texas courts regularly uphold restrictive covenants

and grant injunctions in certain settings.[177] Here, Anguiano signed the Amended LLC

Agreement, thereby agreeing to non-compete and non-solicitation covenants.[178] Accordingly, a

preliminary injunction enforcing these restrictive covenants in the Amended LLC Agreement is

in the public interest. The fourth factor is satisfied.

## IV.    CONCLUSION & ORDERS

In sum, Plaintiff has established the four factors required to issue a preliminary

injunction. The court enters the following orders:

1.  It is **HEREBY ORDERED** that "Plaintiff Miner, Ltd.'s Renewed Motion for
    Preliminary Injunction" [ECF No. 20] is **GRANTED**.

2.  It is **FURTHER ORDERED** that Defendants Paseo Del Norte and Paul Anguiano
    are **ENJOINED** from the following activities:

3.

    a.  Paul Anguiano is enjoined from competing against Miner, Ltd. in El Paso
        County, Texas and the country of Mexico.

    b.  Paseo Del Norte and Paul Anguiano is enjoined from soliciting and doing
        business with clients of Miner that Anguiano served during his employment
        with Miner.

4.  Miner **SHALL** post a bond in the amount of $200,000 as security, which the court
    finds adequate for payment of such damages as any party may be entitled to recover
    as a result of a wrongful restraint under this order.

---

[176] *Google, Inc. v. Hood*, 822 F.3d 212, 220 (5th Cir. 2016) (citing *Lake Charles Diesel, Inc. v. Gen. Motors Corp.*, 328 F.3d 192, 195–96 (5th Cir. 2003)..

[177] *See, e.g., Amerispec, Inc. v. Metro Inspection Servs., Inc.*, No. 3:01-CV-0946-D, 2001 WL 770999, at *6 (N.D. Tex. July 3, 2001) ("It is in the public interest [under Texas Law] to uphold contracts and to enforce a remedy to which the parties have expressly agreed.").

[178] *See* Employment Agreement § 2.

5.  This order shall remain in effect until a final judgment is entered.

**SO ORDERED.**

**SIGNED** this _29_ day of **May, 2019**.

_____
**FRANK MONTALVO**
**UNITED STATES DISTRICT JUDGE**